George J. BAKER, Thomas J. DeGati, Jr., James F. Freeman, Robert G. McNicholl, Michael T. Neville and Paul F. Zminkowski, Plaintiffs,

v.

Donald F. CAWLEY, Michael J. Codd, as Police Commissioners of the City of New York, and the City of New York, Defendants.

No. 73 Civ. 4631 (CES).

United States District Court, S. D. New York.

Oct. 31, 1978.

Phillips, Nizer, Benjamin, Krim & Ballon, David L. Bressman, Litman, Friedman & Kaufman, Herman Kaufman, New York City, for plaintiffs.

Allen G. Schwartz, Corp. Counsel of the City of New York, Rosemary Carroll, New York City, for defendants.

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiffs, former New York City policemen, challenge the constitutionality of New York City Administrative Code § 434a–20.0, which authorized their suspension without pay for the period between the filing of departmental charges against them and the final determination of those charges, which resulted in their dismissal from the police force. Plaintiffs Baker, DeGati, Zminkowski, McNicholl and Neville were members of the 13th Division of the Brooklyn North Public Morals District and were allegedly involved in a bribe-soliciting and receiving scheme, known as a "pad", in connection with illegal gambling activities in their Division. For his role in the pad, which provided monthly payments to officers in the Division in exchange for which the officers would refrain from making arrests, each of the plaintiffs was suspended from his duties as a police officer on May 9, 1972. Plaintiffs' trials on the charges began on November 1, 1973, and ended on May 30, 1974. The trials comprised thirty-nine sessions, held in the evenings at plaintiffs' requests. Plaintiffs were found guilty of the charges against them and were dismissed from the police force on November 18, 1974. Plaintiff Freeman, assigned to the 15th Division Plain-clothes Squad, was suspended on April 25, 1972 for soliciting and receiving a bribe to ignore and not report heroin in the possession of the alleged bribe-giver. Freeman's trial took place on January 18 and 19 and February 21, 1973. He was found guilty and dismissed from the force on April 9, 1973. Although many of their fellow officers were indicted and tried for criminal offenses arising out of bribe-soliciting and receiving schemes, none of the plaintiffs faced criminal charges.

From the date that each plaintiff was suspended, none received any compensation from the Police Department. Thus, plaintiffs Baker, DeGati, Zminkowski, McNicholl and Neville were suspended without pay for a period of over thirty months pending their dismissal from the Department, while plaintiff Freeman was suspended without pay for over eleven months. The Police Commissioner's authority to suspend police officers without pay pending the resolution of charges against them is found in § 434a–20.0 of the New York City Administrative Code. This section reads:

*Suspension of members of force.*—The commissioner shall have power to suspend, without pay, pending the trial of charges, any member of the force. If any member so suspended shall not be convicted by the commissioner of the charges so preferred, he shall be entitled to full pay from the date of suspension notwithstanding such charges and suspension.

Plaintiffs' complaints charge that their constitutional rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution were violated by the operation of § 434a–20.0. Their suits are brought under 42 U.S.C. § 1983, with jurisdiction resting on 28 U.S.C. § 1343. Named as defendants are Donald F. Cawley and Michael J. Codd, former Police Commissioners, and the City of New York. The relief originally sought by plaintiffs consisted of damages and declaratory and injunctive relief. Because plaintiffs' departmental trials have already been completed and they have been dismissed from the police force, their request for an injunction against their payless suspension is moot. Also no longer in issue is plaintiffs' claim that they have been denied due process, a claim which has apparently been abandoned.[1] The sole re-

---

1. Plaintiffs Baker, DeGati, Zminkowski and Freeman state in their Trial Brief, at p. 1, that plaintiffs will show at trial that § 434a–20.0 violates the Equal Protection Clause of the Fourteenth Amendment. No mention is made of the Due Process claim contained in their complaint. Similarly, plaintiffs McNicholl and Neville argue in their brief in support of their

maining issue, therefore, is whether § 434a–20.0 has denied plaintiffs the equal protection of the law.

■ The equal protection challenge is based on the fact that police officers in New York City are the only civil service employees in the State of New York who may be suspended without pay pending the resolution of formal charges for a period longer than thirty days. § 75(3) of the New York Civil Service Law (McKinney's 1973) forbids payless suspensions of civil servants for more than thirty days:

> Suspension pending determination of charges; penalties. Pending the hearing and determination of charges of incompetency or misconduct, the officer or employee against whom such charges have been preferred may be suspended without pay for a period not exceeding thirty days. . . .

Thus, even though a civil service employee may ultimately be found guilty of the charges against him and dismissed, he will nonetheless be entitled to full pay for any period of suspension in excess of thirty days. *E. g., Cassidy v. Police Department, County of Nassau,* 54 A.D.2d 682, 387 N.Y. S.2d 266 (2d Dept.1976). However, New York City police officers are not afforded this protection. The thirty-day limitation contained in § 75(3) has been held to be inapplicable to suspensions of New York City police officers pursuant to § 434a–20.0. *E. g., Scornavacca v. Leary,* 38 N.Y.2d 583, 381 N.Y.S.2d 833 (1976); *Cugell v. Monaghan,* 201 Misc. 607, 107 N.Y.S.2d 117 (S.Ct. New York Co. 1951). The authority for the inapplicability of § 75(3) is found in § 76(4) of the New York Civil Service Law, *Cugell*

*v. Monaghan, supra,* 107 N.Y.S.2d at 124–25, which states in relevant part:

> Nothing contained in section seventy-five or seventy-six of this chapter shall be construed to repeal or modify any general, special or local law or charter provision relating to the removal or suspension of officers or employees in the competitive class of the civil service of the state or any civil division. . . .

Since § 434a–20.0 and its predecessors date back to 1898 (it was codified as part of the New York City Administrative Code in 1917), and since the thirty-day limitation on payless suspensions came into being in 1941, *id.,* 107 N.Y.S.2d at 124, the New York City Police Commissioner's authority to suspend officers indefinitely pending departmental trials was unaffected by the enactment of § 75(3) and its predecessors.[2] It is this unequal and harsh treatment of which plaintiffs complain.

The case is currently before us on cross-motions for summary judgment. The Corporation Counsel of the City of New York ("the City"), representing the defendants, has moved for summary judgment on the grounds that § 434a–20.0 does not deprive police officers of the equal protection of the laws. Plaintiffs have moved for partial summary judgment on the issue of liability, claiming that, as a matter of law, § 434a–20.0 denies them equal protection.

We deal first with the City's argument that the equal protection claims of DeGati, Freeman, McNicholl and Neville are barred by res judicata. After they had been dismissed from the Police Department, these plaintiffs brought proceedings in New York State Supreme Court, pursuant to Article

motion for summary judgment only that § 434a–20.0 violates the Equal Protection Clause.

**2.** The statutory scheme is particularly relevant to the question of whether it is the State or the City that establishes the complained-of classification (*see* discussion, *infra*). The State's role was a passive one, as can be seen from the text and context of § 76(4). § 76(4) in effect allowed § 434a–20.0 of the New York City Administrative Code to remain in force, notwithstanding the thirty-day limitation of § 75(3).

§ 76(4) did not authorize or directly contribute to the establishment of any particular classification; it merely recognized that certain state agencies and municipalities possessed unique problems that had been dealt with in the past by methods which were thought to be necessary to solve the problems. Rather than erase those efforts by blanket application of § 75(3) or other subsections of §§ 75 and 76, the legislature specified in § 76(4) that such local measures already in existence would not be disturbed.

78 of the New York Civil Practice Law and Rules (McKinney's 1963), challenging the actions of the Police Commissioner. DeGati, McNicholl and Neville each contended that the delay in instituting their departmental trials violated their constitutional rights to a speedy trial and that they were prejudiced by the delay. In addition, McNicholl and Neville argued that the delay in bringing them to trial before the Department denied them due process of law and each sought back pay for the period of unreasonable delay. Freeman's Article 78 petition assailed the sufficiency of the evidence against him and did not raise any questions concerning the constitutionality of the proceedings or the delay in bringing them. None of the Article 78 petitions raised the equal protection question which is before us in this case, even though it could have been raised in the form of an action for a declaratory judgment. *Matter of Kovarsky v. Housing & Development Administration*, 31 N.Y.2d 184, 335 N.Y.S.2d 383, 286 N.E.2d 882 (1972). The City claims that the equal protection claims of these plaintiffs are barred by res judicata because they could have been brought in the Article 78 proceedings. It is clearly the law in this Circuit that res judicata does not apply in § 1983 suits with respect to claims that could have been but were not raised in a prior state suit. *Graves v. Olgiati*, 550 F.2d 1327, 1329 (2d Cir. 1977) (Kaufman, C. J.); *Lombard v. Board of Education*, 502 F.2d 631, 635–37 (2d Cir. 1974), *cert. denied*, 420 U.S. 976, 95 S.Ct. 1400, 43 L.Ed.2d 656 (1975); *Williams v. Sclafani*, 444 F.Supp. 906, 915 (S.D.N.Y.1978). Plaintiffs' equal protection claims, therefore, are not precluded from being raised in this Court, and we now turn to the merits of those claims.

■ Because this case does not involve a suspect classification or a fundamental constitutional right, the appropriate standard of review is the traditional standard, which requires us to uphold the provision of the City's Administrative Code under attack here if it bears some rational relationship to legitimate City aims. *San Antonio School District v. Rodriguez*, 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973). Plaintiffs bear the burden of demonstrating that there is no rational connection between the Code provision and the aims which it purports to further. *Kelley v. Johnson,* 425 U.S. 238, 247, 96 S.Ct. 1440, 1445, 47 L.Ed.2d 708 (1976). Legislatively-created classifications will not be set aside as unconstitutional unless it can be shown that they are wholly unrelated to the objective of the statute or ordinance which created the classification. *Massachusetts Board of Retirement v. Murgia,* 427 U.S. 307, 314–16, 96 S.Ct. 2562, 2567, 2568, 49 L.Ed.2d 520 (1976). To put plaintiffs' burden in more concrete terms, they must prove that the power of the Police Commissioner to suspend New York City police officers indefinitely pending the trial of charges against them, while all other civil service employees of the City and State of New York may be suspended without pay for no more than thirty days pending resolution of charges against them, is wholly unrelated to the aims of § 434a–20.0, which historically have been recognized as to ensure the integrity and competency of the New York City Police force. The question before us, then, is whether the power to suspend police officers accused of departmental infractions or crimes furthers in any way the goal of preserving the integrity of the police force and the public's perception thereof.

Plaintiffs McNicholl and Neville argue that the state discriminates against police officers in New York City in that only they may be suspended without pay beyond thirty days and that the unequal treatment furthers no legitimate state interest. They contend that New York City Police perform the same functions as police elsewhere in New York State and that mere location in New York City is insufficient to justify the differentiation in treatment. They also argue that Transit and Housing Authority Police perform the same functions as New York City policemen, but the former may be suspended without pay for no more than thirty days. Before turning to the substance of these arguments, we think it appropriate to point out that it is not the State but the City that treats New York City police officers differently from other

civil service employees.[3] While the manner in which the State and other municipalities within the State treat their civil servants, particularly their police, may be relevant to the determination of whether § 434a–20.0 is rationally related to a legitimate City interest, the ultimate question for us to answer is whether the *City* acted rationally in enacting § 434a–20.0 or whether the different treatment of New York City police officers is simply irrational discrimination. We add that even if no other civil service employee anywhere in the state can be suspended indefinitely without pay, that fact alone does not necessarily mean that § 434a–20.0 of the New York City Administrative Code violates plaintiffs' equal protection rights.

Plaintiffs Baker, DeGati, Zminkowski and Freeman make arguments substantially similar to those made by McNicholl and Neville. They argue that § 434a–20.0 is not related to competent performance, as evidenced by the fact that Transit and Housing Authority police are not subject to its provisions but are protected by § 75(3) of the New York Civil Service Law, *supra*; and further that the City has failed to show how payless suspension is related to job performance. Not only has the City failed to show the rationality of § 434a–20.0, plaintiffs argue, but the Police Commissioner has admitted its irrationality by issuing an Interim Order (discussed *infra*) which provides for "modified assignments" rather than payless suspensions for police officers who have been accused of offenses similar to those of which plaintiffs were accused.

First, plaintiffs are mistaken when they assume that the City has the burden of showing the rationality of § 434a–20.0—the burden is clearly plaintiffs' to prove its irrationality. *Massachusetts Board of Retirement v. Murgia, supra*; *Kelley v. Johnson, supra*. Bearing in mind that the City has no burden to prove the rationality of the Code provision, we turn to the justifications offered by the City for the Code's different treatment of New York City police officers.

The City contends that the power to suspend indefinitely without pay is necessary to maintain the quality of the work force, to cut off a rogue police officer's access to the power which he has corrupted, and so to further public acceptance of and confidence in the police force. The City argues that § 434a–20.0 not only ensures a greater measure of integrity among the members of the force because of its promise of swift and harsh punishment for offenders, it also adds to the public's perception of the integrity of the force by isolating corrupt officers from the force and removing them from the payroll, thereby eliminating any appearance of the Department's complicity in the acts of the suspended officer. The City points out, too, that New York City police officers are different from Transit and Housing Authority police in that the comparatively limited functions and geographical jurisdiction of the latter do not give rise to the opportunities for corruption available to the former.[4]

It cannot be denied that police officers are different from other civil service employees. In deciding that the thirty-day payless suspension limitation of § 75(3) did not apply to New York City police officers, the Court in *Cugell v. Monaghan, supra*, 107

**3.** *See* n. 2, *supra*. Also, McNicholl and Neville's assertion that the state discriminates against them is difficult to fathom in the context of this case, for the complaint names only New York City defendants. But, in any event, even assuming that the state created the allegedly offending classification, the uniqueness and magnitude of the problems of a city of the size and complexity of New York City would more than likely provide a rational basis for treating its policemen differently from those of smaller cities and rural counties.

**4.** Although Transit Authority police officers are vested with police officer status, their duty is limited to areas "in and about transit facilities." New York Public Authorities Law § 1204(16) (McKinney's 1970). The New York City police officer, by contrast, is sworn to enforce the laws of New York State twenty-four hours a day and his geographical boundaries are those of New York State. New York City police officers are also charged with the responsibility of investigating and curtailing vice operations of all kinds, of regulating commercial, licensed enterprises, and of investigating organized crime and racketeering—all areas of responsibility where plentiful opportunities for corruption abound. *See* Affidavit of Deputy Police Commissioner Conboy.

N.Y.S.2d at 122, stated the difference as follows:

It was apparently recognized by the legislative body which prepared these laws that the Police Department required special statutes, which are not to be found in the laws pertaining to other departments. It has often been stated that a police officer occupies a unique position as an employee of the City of New York. . . . It is unquestionably true that to enable a police officer to carry out the functions of his office there must be in the eyes of the Police Commissioner and the public the greatest confidence in the integrity of the officer. The slightest suspicion cast upon the honesty and integrity of the police officer makes his services to the Department and to the public, at best, doubtful. The public interest would be seriously jeopardized in the instance of a police officer if he were allowed to be incompetent or charged with misconduct and it was required that he be retained in office, pending the hearing of the charges. This does not necessarily apply to employees in other City Departments. That it was intended that there be a distinction in the powers of suspension of the Police Commissioner and those of the heads of other departments will be found in various Sections of the Administrative Code relating to the several city departments.

The question, however, is not simply whether New York City police officers are different from all other civil service employees, but whether the different treatment they receive is rationally related to the difference between them.

█ If the purpose of § 434a–20.0 is to allow the Police Commissioner to act surely and swiftly to weed out those officers who, in the Commissioner's judgment, ought to be isolated from the rest of the Department to ensure both the integrity and the appearance of the integrity of the Police Department, as we think it is the purpose of § 434a–20.0 to do, it certainly is rationally related to these legitimate legislative aims.

If, for example, the Commissioner were not permitted to remove the taint of a police officer who has committed serious offenses, the Department as a whole would suffer, both from within as a result of the corrupting influence of the officer on other members of the force, and from without as a result of public skepticism about the Department's ability and inclination to police itself. The case of these plaintiffs offers a suitable example. All except Freeman were charged by the Department with participating in a widespread bribe-soliciting and receiving scheme, whereby officers would solicit and accept money in return for not investigating or arresting persons involved in illegal gambling activities.[5] Their roles in the "pad" were widely publicized when the results of the investigation into the scheme were made public—a major network of police corruption had been uncovered. Under these circumstances, the power of the Police Commissioner to suspend these officers without pay seems almost beyond question. To continue these officers on the Department's payroll, even under a system of "modified assignment", pending the resolution of the serious charges against them, charges which stemmed from the corrupt use of the power of their offices, would raise legitimate questions in the public's mind about the sincerity of the Commissioner's war on police corruption and undermine the self-respect of the members of the police force.

Thus, we think that the Commissioner's power to suspend police officers without pay and for an indefinite period of time pending a hearing of the charges against them is rationally related to the object of § 434a–20.0, which is to further the goal of a police force that is above reproach and that is respected and trusted by the public. In making this determination, we note that the Commissioner's power is not unfettered. The length of the suspension occasioned by the delay in hearing the charges against an officer will be judged in each case by standards of due process of law. *See Brenner v.*

---

**5.** This case is also a prime example of the opportunities for corruption available to New York City police that are not available to Transit and Housing Authority police.

*City of New York,* 9 N.Y.2d 447, 214 N.Y. S.2d 444, 446, 174 N.E.2d 526 (1961). We also note that the power of the Commissioner can produce harsh results and that many situations involving police officers who have been charged with misconduct may be satisfactorily handled by less draconian measures. However, the fact that other, perhaps better, methods are available does not require that we strike down § 434a–20.0, which, though not precisely tailored to the task set out for it, nonetheless is a rational means for accomplishing it. *Massachusetts Board of Retirement v. Murgia, supra,* 427 U.S. at 316–17, 96 S.Ct. at 2568–2569.

Plaintiffs also make the contention that the City admitted the irrationality of § 434a–20.0 when it devised and put into effect a less drastic method of advancing the aims of that Code provision. On October 15, 1974, then Police Commissioner Codd, a defendant herein, issued Interim Order No. 71, accompanied by a press release, which Order was to take effect the following day. The Order specifies conditions under which members of the police force may be suspended or placed on "modified assignments". The decision to suspend or place on modified assignment a member of the force is generally left to the discretion of the Commissioner or a Deputy Commissioner, "when he believes such action to be necessary." The Order sets forth three specific situations in which an officer must be suspended and four circumstances under which an officer may be placed on modified assignment. While on modified assignment, the officer continues to receive his pay and may or may not be asked to surrender his weapon. This alternative to suspension was enacted, according to Commissioner Codd's press release, "for humanitarian and administrative reasons", and in recognition of the principles that "a police officer accused of misconduct is entitled to the same presumption of innocence accorded members of any professions" (sic) and that "proper administration of our law enforcement function does not require suspension in every instance in which police misconduct is alleged." The press release acknowledges the hardship imposed by suspension upon the officer and his family and the need to minimize pretrial suspensions and rely instead on speedy and fair departmental trials. Finally, it states that "the public suffers from the loss to the police force of experienced officers" resulting from suspensions.

■ Plaintiffs contend that Interim Order No. 71 and the press release constitute admissions by the Police Department that payless suspension is not necessary to maintain the integrity of the force and that, therefore, § 434a–20.0 has no rational basis. They point to the absence of soliciting and receiving bribes among the offenses for which an officer must be suspended and to its presence among those for which a member of the force may be placed on modified assignment.[6] They conclude that because the offenses for which they were suspended do not warrant mandatory suspension under the terms of Interim Order No. 71 but only fall within that category of offenses for which a member may be placed on modified assignment, suspension in their cases served only to punish them and not to further any legitimate aims of the City, by the Commissioner's own admission. This conclusion is erroneous for at least two reasons. First, it ignores the first paragraph of the Order which states that "[t]he Police Commissioner or a Deputy Commissioner *when he believes such action to be necessary,* may suspend or place on modified assignment a member of the department." (Emphasis added.) While the Order specifies certain conditions in which an officer may be placed on modified assignment, nothing in the Order relieves the Commissioner of his power to suspend the officer rather than place him on modified assignment, when the Commissioner in his discretion believes such action to be necessary for the good of

---

**6.** ¶ 3(c) of Interim Order No. 71 reads:

A superior officer in-charge or in-command may place a number of the service on modified assignment when the member:

c. Is served with CHARGES AND SPECIFICATIONS (PD 468–121) alleging wrongful solicitation and/or receipt of monies or other gratuities; . . .

**1308**

the department. Second, even if plaintiffs are correct that by issuing Interim Order No. 71 and the press release the Commissioner admitted that payless suspensions are not necessary to the integrity of the police force, that is not to say that the power to effect payless suspensions is not rationally related to the maintenance of the integrity of the force. As we said above, the facts that a legislative enactment may produce in our view too harsh a result under some circumstances and that other, less drastic means might be employed to achieve the same legislative ends do not require that we find the legislation unconstitutional as violative of equal protection rights guaranteed under the Fourteenth Amendment. *Massachusetts Board of Retirement v. Murgia, supra,* 427 U.S. at 316–17, 96 S.Ct. at 2568–2569. It is enough to sustain the legislation if it rationally furthers a legitimate state (or municipal) interest. *Id.,* 427 U.S. at 314–16, 96 S.Ct. 2567–2568.

Since as to the question of whether § 434a–20.0 violates the equal protection clause of the Fourteenth Amendment there are no facts in dispute, each side having moved for summary judgment on that question, defendants' motion for summary judgment is granted. *Heyman v. Commerce & Industry Ins. Co.,* 524 F.2d 1317, 1320 (2d Cir. 1975). Also, since plaintiffs have abandoned their claims under the due process clause of the Fourteenth Amendment,[7] there appear to be no issues remaining in this lawsuit.

Accordingly, the complaints are dismissed.

SO ORDERED.